UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DENNIS AURAND ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | NO. 3:08-CV-398 PPS |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION and ORDER**

Defendant Norfolk Southern Railway Company seeks summary judgment based on a release that was signed by Plaintiff Dennis Aurand in an earlier case that he brought against Norfolk. (DE 30.) But because there are material facts in dispute as to the validity of the release, Norfolk's motion is denied.

**Background**

I'll start with the facts that are undisputed, and for those facts in dispute, I address them below in the discussion section. Dennis Aurand began working as a yard conductor at a railroad yard in Elkhart, Indiana in 1974. Norfolk took control of the Elkhart yard in June 1999, and Aurand retired from Norfolk in 2006. Aurand filed the present action against Norfolk on August 26, 2008. He brings a claims under the Federal Employers' Liability Act ("FELA"), alleging that he developed multiple myeloma from exposure to chemicals at the Elkhart yard. Multiple myeloma is a form of cancer of the plasma cells in bone marrow. After this case was filed, Mr. Aurand died from complications relating to the myeloma.

Prior to this suit, in August of 2004, Aurand filed a different suit against Norfolk in the United States District Court for the Eastern District of Pennsylvania, alleging damages related to his occupational exposure to asbestos. In that lawsuit, Aurand alleged injuries related to asbestosis. While his earlier case was pending, in November 2005, Aurand was diagnosed with the multiple myeloma that is now the subject of this case. Norfolk Southern and Aurand settled the earlier lawsuit dealing with his exposure to asbestos for $7,500, and Aurand signed a standard release agreement drafted by Norfolk Southern. (DE 31, at 2; DE 33-2, at 2-3.)

The release was signed by Aurand on February 13, 2007 after Aurand had retired from Norfolk . The four-page release states the following:

> Dennis L. Aurand . . . does hereby RELEASE AND FOREVER DISCHARGE Norfolk Southern Railway Company, CSX Transportation, Inc., . . . of and from all liability for claims or actions known and unknown, manifested and unmanifested, suspected and unanticipated pulmonary respiratory diseases, and/or injuries including but not limited to medical and hospital expenses, pain and suffering, loss of income, increased risk of cancer, fear of cancer, and any and all forms of cancer, including mesothelioma, asbestosis and silicosis arising in any manner whatsoever, either directly or indirectly, in whole or in part, out of exposure to any and all toxic substances, including asbestos, silica, sand diesel fumes, diesel exhaust, welding fumes, chemicals, solvents, toxic and other pathogenic particulate matters, coal dust, and all other dusts, fibers, fumes, vapors, mists, liquids, solids, or gases during RELEASOR'S employment with RELEASEE. The parties agree that a portion of the consideration paid for this RELEASE is for risk, fear, and/or possible future manifestation of the injuries or diseases described in this paragraph.

(DE 31-4, at 2.)

Aurand's signature on the release was notarized and witnessed by two individuals. (DE 31-4, at 5.) The signature page also contained a certificate signed by an attorney, stating the following:

> I hereby certify that on the day and year above specified, I explained the foregoing RELEASE to **DENNIS L. AURAND,** and I explained to him the legal consequences of the execution and delivery of said RELEASE and that he executed same

voluntarily and appeared to have full knowledge thereof.

(*Id.*)

The parties dispute whether Aurand released his multiple myeloma claim when he signed this release. Norfolk's Motion for Summary Judgment on Release alleges that Aurand's prior release bars his current suit in this Court. Aurand's rejoinder is that he had no intention of releasing his current claim because at the time he signed the release, he didn't even know that his myeloma was connected to his employment at the Elkhart yard.

## **Discussion**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelly & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. In making this determination, I must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

Under FELA, any contract where the purpose is to "exempt" an employer from "any liability" under FELA is void. 45 U.S.C. § 55. The Supreme Court has held that a release

signed by an employee to compromise a claim is not considered a device to "exempt" an employer from "liability." Instead, it is simply a means of compromising a claimed liability. *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 631, 68 S.Ct. 296, 298 (1948). Thus, an employer may plead "release" as an affirmative defense, and to succeed on the defense, the employer must establish that the release was executed as a part of a negotiation settling a claim between the employee and the employer. *Wicker v. Consolidated Rail Corp.*, 142 F.3d 690, 700 (3d Cir. 1998) ("release must at least have been executed as part of a negotiation settling a dispute"). To determine a release's validity, courts evaluate the parties' intent at the time the agreement was made because the release itself is "strong, but not conclusive evidence of the parties' intent." *Wicker*, 142 F.3d at 701; *Forry, Inc. v. Neundorfer*, 837 F.2d 259, 263 (6th Cir. 1988). Federal, not state law, governs the validity of releases under FELA. *Maynard v. Durham &S. Ry. Co.*, 365 U.S. 160, 161 (1961).

The analysis of a release as an affirmative defense under FELA is inherently fact-bound, and so any factual dispute should usually be decided by a jury. *Id.*; *see Sea-Land Serv., Inc. v. Sellan*, 231 F.3d 848, 852 (11th Cir. 2000) ("cases involving the validity of releases under FELA are fact-driven"); *Turner v. Burlington Northern R. Co.*, 771 F.2d 341, 344 (8th Cir. 1985) (noting that the Supreme Court has "repeatedly emphasized that Congress intended that FELA lawsuits would be tried to the jury").

The Sixth Circuit has held that for a release to be valid it "must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown to him." *Babbit v. Norfolk Western Railway Co.*, 104 F.3d 89, 93 (6th Cir. 1997). By contrast, the

4

Third Circuit has held that the "scope of the release is limited to those risks which are known to the parties at the time the release is signed." *Wicker*, 142 F.3d at 701. The difference between the approach taken by the Sixth Circuit in *Babbit* and the Third Circuit in *Wicker* is that *Babbit* focuses on "injuries" whereas *Wicker* places the focus on known *risks of injury* at the time the release is signed. But even under the approached taken in *Wicker*, releases that mechanically detail a laundry list of diseases or hazards that could conceivably be encountered by a railroad worker are viewed skeptically and are not conclusive of the parties intent. *Wicker*, 142 F.3d at 701.

The distinction between the approaches taken by the Sixth Circuit and Third Circuit is immaterial here because Aurand defeats summary judgment under either approach. To begin with, the four-page release at issue here contains the very type of laundry list of waived claims that *Wicker* suggests that I should look upon with suspicion. (DE 31-4.) For this reason, the release alone is not conclusive, and I need to evaluate the circumstances under which Aurand signed the release to determine if it is valid. *See Wicker*, 142 F.3d at 701.

Norfolk contends that the circumstances surrounding the release indicate that Aurand knew and understood the terms of the release. Norfolk first argues that the release is a valid affirmative defense because Aurand had assistance from an attorney when he signed the release. (DE 31, at 3.) Norfolk points to the certificate signed by an attorney that stated he had discussed the terms of the release with Aurand. (DE 31-4, at 5.) But Aurand's deposition testimony disputes this. Aurand claims that his attorney never explained the release language and legal consequences of it. (DE 33-2, at 2-3; Aurand Dep. at 65.) Specifically, Aurand testified that his attorney, Tom Joyce, did not review the release language with him. Instead, he merely received

5

the release in the mail from Mr. Joyce. (Aurand Dep. at 65.) Norfolk's response implies that Aurand's testimony isn't believable. (DE 34, at 5.) But such a response is ill-conceived since weighing credibility is not appropriate at the summary judgment stage of proceedings. *Washington v. Haupert*, 481 F.3d 543, 549 (7th Cir. 2007).

In addition, in reviewing the attorney certificate Norfolk relies on, the signature is illegible. (DE 31-4, at 5.) And Norfolk did not provide an affidavit from Aurand's attorney, Mr. Joyce, supporting the contention that he actually explained the release's contents to Aurand. Accepting Aurand's affidavit as being true – as I must at this time – there is a dispute as to whether Aurand was properly represented when he signed the release.

The parties also dispute what Aurand understood he was actually releasing in 2007. *See Forry*, 837 F.2d at 263 (emphasizing that FELA release interpretation must take the parties' intent into account and that "general language of release will not encompass claims of which the releasor was unaware"). Norfolk alleges facts that suggest that Aurand was aware that he had multiple myeloma when he signed the release and that he knew he was releasing claims related to those risks. Aurand was referred to Dr. Abonour after his multiple myeloma diagnosis. Norfolk claims that Dr. Abonour explained to Aurand the cause of the myeloma to be his exposures at the yard. (DE 34, at 2.) But Norfolk's characterization of what the doctor said is an overstatement. Norfolk claims that Dr. Abonour and Aurand discussed the fact that his exposures at the Elkhart yard caused his multiple myeloma. (DE 34, at 2.) However, in his deposition, Dr. Abonour's didn't state that they discussed the Elkhart yard exposures as a cause of the myeloma. Rather, Dr. Abonour stated that he spoke generally with Aurand about the causes of the disease. Here's Dr. Abonour's recollection of the discussions he had with Aurand:

6

> So I think I try to address chemical exposures or the like because I think always the patient has, you know, wonder why me and why did I get the disease, which is a relatively rare disease. . . . So, so I remember of the year we have discussed that on several occasions in his visits because he was always curious why did he get the disease.

(Abonour Dep. At 7-8.) This vague statement by Dr. Abonour that he and Aurand "discussed" why Aurand got the disease doesn't come close to establishing that Dr. Abonour told him the disease was caused by the Elkhart yard exposures.

And even if Dr. Abonour testified that he specifically told Aurand that his multiple myeloma was caused by the Elkhart yard, Aurand denied this fact in his deposition and in his affidavit. Specifically, Aurand stated that when he signed the release, he didn't know that his multiple myeloma was caused by exposures at the Elkhart yard. (DE 33-4 ¶ 4.) He learned this much later. The bottom line is that Aurand believed that he was merely releasing his claims related to asbestosis. (*Id.* ¶ 5; Aurand Dep. at 64, DE 33-3, at 2.) Because he understood asbestosis to be a lung disease and multiple myeloma to be a blood disease, he did not believe that the two diseases were from the same exposure. (DE 33-4 ¶ 3.)

The vagueness of Dr. Abonour's statements, combined with Aurand's testimony that he did not know that his multiple myeloma was related to his work at the Elkhart yard, creates a factual issue as to whether Aurand knew that he was releasing his multiple myeloma claim in the release. In sum, there are factual issues related to the release that would be most appropriately resolved by a jury.

Norfolk points to several state court decisions upholding FELA releases, but they don't convince me that summary judgment is appropriate here. First, Norfolk relies on *Jacqua v.*

*Canadian Nat'l RR, Inc.*, 734 N.W.2d 228, 237 (Mich. Ct. App. 2007). In *Jacqua*, the plaintiff released his employer from liability for asbestos exposure and asbestosis, along with cancer. At the time, he knew he was at risk of developing cancer because his doctor had advised him of that risk. *Id.* at 229. Jacqua subsequently filed suit after he developed lung cancer, and the court held that the release was valid and Jacqua's claim was barred. *Id.* at 237. *Jacqua* is distinguishable on a couple of grounds. First, the plaintiff in *Jacqua* negotiated the release with the advice and assistance of counsel. Here, Aurand has presented an issue of fact as to whether he received advice from counsel indicating that he knew he was releasing the multiple myeloma claim when he signed the release. (Aurand Dep. at 64-65). In addition, *Jacqua* is a case involving asbestos exposure and the release extinguished future claims relating to lung cancer. Lung cancer can be caused by exposure to asbestos. So when the plaintiff in *Jacqua* released his lung cancer claim following exposure to asbestos, even though he did not have lung cancer at the time the release was signed, he was releasing a known risk. The same cannot be said of Mr. Aurand's release where it is not nearly as clear that multiple myeloma was a natural consequence of what he was exposed to at the Elkhart yard, and there is no evidence that anyone told him that it was.

Norfolk also relies on *Loyal v. Norfolk Southern Corp.*, 507 S.E.2d 499, 503 (Ga. App. Ct. 1998) where the plaintiff was suing for damages related to hearing loss, but he had signed a release as a part of his retirement package that stated that he was releasing all of his claims against Norfolk in exchange for $50,000. *Id.* at 698-99. Loyal later sued Norfolk, alleging that the release was void because it exempted Norfolk from liability in violation of 45 U.S.C. § 55. The court disagreed, concluding that because Loyal did not state that he was unaware that the

release covered all future claims, the release was valid. *Id.* at 503. This case is also distinguishable because Aurand alleges that, although he knew about the risks and his injury at the time of the release, he was unaware that he was releasing claims related to those risks. (Aurand Dep. at 64-65.) Thus, unlike the plaintiff in *Loyal*, Aurand presents an issue as to whether the release was entered into with the intent to waive his multiple myeloma claim.

Finally, Norfolk points to *Illinois Central RR Co. v. Acuff*, 950 So. 2d 947, 965 (Miss. 2006), but that case is of no help to Norfolk. For starters, *Acuff* dealt with several plaintiffs, and the court affirmed the district court's denial of a motion to dismiss as to some plaintiffs because the releases – like the one in this case – were too boilerplate in nature. *Id.* at 961. More importantly, in *Acuff* the court was convinced that the plaintiff knew the claim he was releasing. But here I'm not convinced that Aurand knew he was releasing his multiple myeloma claim when he signed a release dealing with asbestos exposure. Aurand's deposition testimony and affidavit indicate that there is, at the very least, a question of fact about whether Aurand knew that his multiple myeloma could have been attributed to his time at the Elkhart yard.

In sum, FELA release analysis is fact-intensive, emphasizing the parties' intent at the time the release is signed. *Wicker*, 142 F.3d at 701. So the question I need to resolve is whether the record shows that there is no factual dispute concerning the validity of the release. But all that Norfolk points me to is the boilerplate language of the release, a certificate at the end of the release signed by an attorney stating that he explained the terms of the release to Aurand, and murky testimony from a doctor who discussed causes of the disease with Aurand but only in the most general of terms. Aurand contests those facts with his deposition testimony and an affidavit stating that he didn't realize he was releasing the multiple myeloma claims, an attorney did not

9

explain the release to him, and his doctor did not link his multiple myeloma to his work at the Elkhart yard. There is therefore a genuine dispute of fact as to Aurand's intent and thus the validity of the release, and these are issues for a jury to resolve.

Norfolk's Motion for Summary Judgment on Release (DE 30) is **DENIED**.

**SO ORDERED.**

**ENTERED**: May 14, 2010

s/ Philip P. Simon<br>
PHILIP P. SIMON, CHIEF JUDGE<br>
UNITED STATES DISTRICT COURT